IN THE UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT OF NORTH CAROLINA
WESTERN DIVISION

NO. 5:22-CT-3127-FL

SHARIF HAKIM MOORE,                )
                                   )
                Plaintiff,         )
                                   )
        v.                         )                    ORDER
                                   )
PETER T. DANZA, JASON JARMAN,      )
ANTHONY J. TAYLOR and MRS. HALL,   )
                                   )
                Defendants.        )


This matter is before the court on defendants' motion for summary judgment (DE 37) pursuant to Federal Rule of Civil Procedure 56. The motion was briefed fully and in this posture the issues raised are ripe for ruling.

## STATEMENT OF THE CASE

Plaintiff, a state inmate proceeding pro se, commenced this action by filing complaint on April 13, 2022, asserting claims for violations of his civil rights pursuant to 42 U.S.C. § 1983. Plaintiff alleges defendants assaulted him and used excessive force during an altercation outside the Jones County Detention Center, in violation of the Eighth Amendment to the United States Constitution. Defendants, sued in both their individual and official capacities, are Peter T. Danza ("Danza") and Jason Jarman ("Jarman"), captains with the Jones County Detention Center ("detention center"), Anthony J. Taylor ("Taylor"), an employee of the Jones County Courthouse, and Mrs. Hall ("Hall"), a detention center officer. As relief, plaintiff seeks compensatory damages and injunctive relief pertaining to the transport of inmates at the detention center.

In accordance with the court's case management order, defendants now move for summary judgment, arguing that the undisputed record shows they did not violate plaintiff's constitutional rights, and that they are each entitled to qualified immunity. Defendants also argue that plaintiff's official capacity claims fail to present any genuine issue of an unconstitutional policy or custom. In support of their motion, defendants rely upon memorandum of law, statement of material facts, and appendix of exhibits thereto, comprising the following: 1) defendants' personal declarations; 2) incident reports; 3) use of force reports; 4) the detention center's use of force policy; 5) statement from Deputy Michael E. Grant ("Grant"); 6) plaintiff's post-incident medical records; and 7) video capturing the use of force incident from defendant Jarman's body camera ("video").

Plaintiff responded in opposition to defendants' motion, relying upon a memorandum of law, opposing statement of material facts, and appendix of exhibits thereto, comprising the following: 1) plaintiff's multiple declarations; 2) records documenting plaintiff's alleged injuries; 3) court documents, correspondence, plaintiff's contemporaneous writings, and other records pertaining to plaintiff's previous legal proceedings; 4) forms and grievances filed with various state agencies; and 5) sworn affidavits by individual third parties; and 6) transcribed news articles.

## STATEMENT OF FACTS

Except as otherwise noted below, the court recounts the facts in the light most favorable to plaintiff. Before addressing the excessive force incidents, the court summarizes plaintiff's prior interactions with defendants and other governmental officials in Jones County, North Carolina, as they are relevant to plaintiff's theory that defendants assaulted him out of personal animus and to coverup evidence of wrongdoing. Plaintiff is required to register as a sex offender in North Carolina, although he disputes the validity of the underlying convictions and that the offenses

2

require such registration. (Pl's Br. (DE 43) ¶¶ 1–5).[1] After plaintiff moved to Jones County, defendant Danza[2] was assigned to supervise his compliance with the registration requirements. (See id. ¶ 6). In February 2016, plaintiff informed defendant Danza that he was placed on the registration list "unlawfully" and that his constitutional rights were violated in the underlying criminal proceedings that required registration. (Id.).

Defendant Danza responded that he "did not care" about plaintiff's legal arguments, and that he must complete a sex offender registration packet explaining the rules and regulations for registering as a sex offender in Jones County. (Id.). According to plaintiff, defendant Danza "did not like it that plaintiff was moving into his county" and he told plaintiff several times to "leave and go back to Virginia." (Id.). Defendant Danza also refused to call various law enforcement agencies or other relevant authorities to confirm plaintiff's allegation that he was not required to register. (Id.).

On an unidentified date, defendant Danza placed a notice on plaintiff's residence stating "please come in to provide our office the address you are sleeping at, and living at. You have [three] business days to respond. Failure could result in a warrant for your arrest." (Id. ¶ 8). Defendant Danza placed the notice on plaintiff's door on a date when he knew plaintiff was not present. (See id. ¶¶ 8–9). Plaintiff did not respond. (Id. ¶¶ 8–12). On or about May 2, 2016, plaintiff was charged in Craven County with failing to report a new address as required by North

---

[1]      Courts treat verified pleadings such as plaintiff's brief as "the equivalent of an opposing affidavit for summary judgment purposes, when the allegations contained therein are based on personal knowledge." Williams v. Griffin, 952 F.2d 820, 823 (4th Cir. 1991).

[2]      Defendant Danza serves as both a detention officer and as a captain with the Jones County Sheriff's office. (Danza Decl. (DE 39-2) ¶ 2). He is also a "captain of the sex offender register" for the county. (Id.).

3

Carolina's sex offender registry laws.   (Id. ¶ 12; Pl's App. Ex. B (DE 45-2) at 19).[3]   On August

6, 2016, plaintiff was charged in a separate case with failing to register as a sex offender in Jones

County.   (Pl's Br. (DE 43) ¶ 12; Pl's App. Ex. B (DE 45-2) at 15).   Plaintiff initially was detained

at the Craven County detention center pending trial on the foregoing offenses.   (Pl's Br. (DE 43)

¶ 12; Pl's App. Ex. B (DE 45-2) at 17).

In the Craven County case, plaintiff proceeded to jury trial, where defendant Danza

testified against him.   (Pl's Br. (DE 43) ¶ 10).   On September 12, 2019, the jury found defendant

not guilty of the offense.   (Id.; Pl's App. Ex. B (DE 45-2) at 19, 22).

Although the record is not clear on this point, it appears plaintiff was released from custody

on an unidentified date after the not guilty verdict in the Craven County case, even though the

Jones County charge remained pending.   (See Pl's Br. (DE 43) ¶ 25 (plaintiff stating defendant

Danza visited him at his private residence between January and May 2021); see also id. ¶ 15

(plaintiff indicating he was housed at the Jones County detention center between June and

November 2021); Pl's App. Ex. B (DE 45-2) at 15 (providing plaintiff was awarded 1,265 days of

pretrial custody credit for the November 2021 convictions, which does not cover the entire period

from August 2016 to November 2021)).[4]   In any event, plaintiff avers (and the court accepts as

true), that defendant Danza visited him at his private residence on an unidentified date between

January and May 2021, and at a time when plaintiff's cousin, Deon Britton, was performing

construction work on his home.   (Pl's Br. (DE 43) ¶ 25; Pl's Stmt. (DE 44) ¶ 5).   During that

---

[3]     Unless otherwise specified, page numbers specified in citations to the record in this order refer to the page number of the document designated in the court's electronic case filing (ECF) system, and not to page numbering, if any, specified on the face of the underlying document.

[4]     Plaintiff remained in custody for some period of time after the Craven County case concluded, as evidenced by jail incident report dated January 22, 2020.   (Jarman Decl. Ex. B (DE 39-1)).

4

visit, defendant Danza was intoxicated, and he was "in a raging state of mind." (Pl's Br. (DE 43) ¶ 25). Defendant Danza attempted to persuade Britton to stop working on the roof of the residence, stating "did you know he's a sex offender? Why are you trying to help a sex offender? Stop working on his house. I am going to catch him. I am going to get him." (Id.). Britton reported that he was concerned for plaintiff's and his own safety during this incident. (Id.).

In June 2021, plaintiff was taken into custody and detained in the Jones County detention center on the failure to register charge discussed above. (See id. ¶ 15). During his pretrial detention, plaintiff became convinced that defendant Danza and other members of the Jones County Sheriff's office, state prosecutors, his criminal defense attorneys, and the superior court judges presiding over the proceedings were detaining him unlawfully and otherwise conspiring to violate his rights. (Id. ¶¶ 14, 17, 19). Plaintiff's general theory is that he is not required to register as a sex offender, that he has proven this fact by presenting various Virginia state court records to defendant Danza and his defense attorneys, but prosecutors and the presiding judges refuse to dismiss the charges. (Id. ¶¶ 1–14, 17; Pl's Stmt. (DE 44) ¶ 8).

He further claims that detention officers at the jail did not permit him to send or receive mail (including legal mail to or from his attorney), that defendant Danza improperly read his mail and listened to his phone calls, and that jail officials did not allow him visits with his attorneys or other members of the community. (Pl's Br. (DE 43) ¶¶ 14–15, 21; Pl's Stmt. (DE 44) ¶¶ 5, 8, 15). In addition, the presiding judges, prosecutors, and his defense attorneys failed to inform him of his trial date and at trial they denied his requests to call witnesses who would testify about the corruption of Jones County law enforcement officials and others. (Pl's Br. (DE 43) ¶¶ 14, 17–19; Pl's Stmt. (DE 44) ¶¶ 8). Plaintiff kept meticulous notes about the alleged corruption, authored

correspondence to federal law enforcement agencies and press outlets regarding same, and even secured sworn affidavits from other detainees suggesting Jones County law enforcement officials violated their constitutional rights in a similar manner. (Pl's Br. (DE 43) ¶ 14; see also Pl's App. Ex. C (DE 45-3)). Furthermore, on an unidentified date while plaintiff was detained, defendant Danza threatened plaintiff, stating "he would beat the [expletive] out of him, and none of his paperwork would ever leave the jail." (Pl's Br. (DE 43) ¶ 25).

Plaintiff pleaded not guilty and proceeded to jury trial in the Jones County matter. (Pl's App. Ex. B (DE 45-2) at 15). Defendant Danza also testified against plaintiff at this trial. (Pl's Br. (DE 43) ¶ 12, 14; see also State v. Moore, No. COA22-368, 2022 WL 16557816, at *1 (N.C. Ct. App. Nov. 1, 2022). Plaintiff was convicted of failure to register and attaining the status of habitual felon on November 18, 2021. (Pl's App. Ex. B (DE 45-2) at 15). He was sentenced to 96 to 128 months' imprisonment. (Pl's Br. (DE 43) ¶ 10, 12; see also Moore, 2022 WL 16557816 at *1.

Turning to the events leading up to the excessive force incidents, plaintiff remained housed at the detention center for approximately 10 days following the convictions. (Defs' Stmt. (DE 42) ¶¶ 9, 13). On November 28, 2021, plaintiff was on a recorded detention center call with an acquaintance, Terrence Holloway, and they discussed contacting the New Bern Sun Journal (a local newspaper) concerning his allegations of corruption and constitutional violations summarized above. (Pl's Br. (DE 43) ¶ 22; Pl's Stmt. (DE 44) ¶ 14). Holloway agreed to contact the newspaper and attempt to arrange a meeting between plaintiff and a reporter the following day. (Pl's Br. (DE 43) ¶ 22; Pl's Stmt. (DE 44) ¶ 14). The two of them also discussed contacting the

6

NAACP about plaintiff's allegations.    (Pl's Br. (DE 43) ¶ 22).

Defendants Danza and Jarman, together with other detention center staff, were monitoring plaintiff's phone calls at the time, and they heard the foregoing conversation.    (Id. ¶ 23).    On November, 29, 2021, the day after the call, plaintiff was informed in the early morning hours that he was being transferred to the Eastern Correctional Institution ("ECI"), in Maury, North Carolina, for service of the state sentence discussed above.    (Id. ¶ 24; Defs' Stmt. (DE 38) ¶¶ 13–14).  Plaintiff avers that defendants elected to transfer him on that date in order to prevent him from speaking with the reporter.    (Pl's Br. (DE 43) ¶ 24; Pl's Stmt. (DE 44) ¶ 14).    In addition, plaintiff surmises that defendant Danza was assigned to transport him so that he could take revenge on plaintiff for the not guilty verdict in the Craven County case, to fulfill his promise to remove plaintiff from Craven County due to his animus for plaintiff personally and for sex offenders generally, and in order to confiscate and destroy plaintiff's records of the alleged corruption in Jones County.    (Pl's Br. (DE 43) ¶ 24; Pl's Stmt. (DE 44) ¶ 14).

Plaintiff repeatedly asserts that defendants Danza, Jarman, and Hall stated that he would not be allowed to take his "paperwork" documenting the alleged corruption and constitutional violations with him to ECI.    (Pl's Br. (DE 43) ¶¶ 26; Pl's Stmt. (DE 44) ¶¶ 17–18, 20).    Plaintiff, however, does not dispute that defendants allowed him to place all the relevant documents into his personal property bag for transport to ECI.    (See id.).    But "to keep transports safe for both officers and [detainees], [detainees] are never allowed to have their property bags with them in the transport vehicle.    Their personal items must either remain in the vehicle trunk or with the detention officers conducting the transport."    (Defs' Stmt. (DE 38) ¶ 4; Jarman Decl. (DE 39-1) ¶

7

9; Danza Decl. (DE 39-2) ¶ 9; Pl's Stmt. (DE 44) ¶ 4).[5]  Detention center policy also provides that inmates are not permitted to access certain sealed personal items, including cell phones and jewelry, at any time, including during transport between prisons.  (Defs' Stmt. (DE 38) ¶ 3; Jarman Decl. (DE 39-1) ¶ 8; Danza Decl. (DE 39-2) ¶ 8).

After plaintiff was informed of the transfer, and consistent with the transportation policy, he changed into his personal clothes and placed the relevant documents into his property bag. (Video 00:00–02:38).  Plaintiff's property bag contained his notes, sworn statements from other detainees, and other materials regarding the alleged corruption and constitutional violations committed by the Jones County officers, but did not include sealed items, such as plaintiff's cell phone or jewelry.  (Pl's Stmt. (DE 44) ¶ 17).  After plaintiff filled his property bag, defendant Jarman instructed plaintiff to sit in a detention center hallway.  (See Video 02:39–40).  Following defendant Jarman's conversation with another officer in the control room (see id. at 02:46–58),[6] defendant Jarman placed plaintiff in wrist and ankle restraints (id. at 03:12–04:28; Pl's Br. (DE 43) ¶ 26),[7] and plaintiff exited the detention center with defendant Danza in front of plaintiff and defendant Jarman behind him.  (Defs' Stmt. (DE 38) ¶ 16; Pl's Stmt. (DE 44) ¶ 16; Video 05:17–47).

Once outside, plaintiff entered the passenger-side backseat of the transport vehicle. (Video 05:47–53).  After plaintiff sat down in the vehicle, defendant Danza asked plaintiff to "see

---

[5]    Plaintiff does not dispute that this policy exists, but he argues that defendant Danza used it as a "pretext to his advantage" to attempt to confiscate plaintiff's papers and in order to create a reason to assault plaintiff.  (Pl's Stmt. (DE 44) ¶ 4).

[6]    This conversation is unintelligible from the video.

[7]    Although plaintiff indicates defendant Danza placed him in restraints, the recording shows that it was defendant Jarman.  (Video 03:12–04:28).

8

[plaintiff's] whole [property] bag . . . the whole bag." (Id. at 05:56–06:00). Defendant Danza repeated to plaintiff, "no, the whole bag . . . with me in the front seat." (Id. at 06:01–04). While the video does not show plaintiff's positioning in the vehicle, plaintiff verbally protested defendant Danza's order. (See id. at 06:04–05 ("Nah . . . man"); see also Pl's Br. (DE 43) ¶ 27 (plaintiff admitting that he refused to relinquish the bag notwithstanding defendant Danza's direct orders)).[8] Defendant Jarman warned plaintiff, "we're not going to deal with this." (Video 06:05–07). At the same time, defendant Danza, standing outside the vehicle, leaned into the backseat of the transport vehicle, before withdrawing and telling plaintiff, "we're not going to put up with it . . . the bag don't stay there with you." (Id. at 06:06–10). Plaintiff began to respond, "I know . . ." but the audio from the video does not capture the rest of the sentence as defendant Jarman rushed over to the driver-side backseat of the transport vehicle. (Id. at 06:10–14).

While the video fails to precisely show plaintiff and defendant Danza's next exchange, a commotion unfolded in the backseat and plaintiff exclaimed "no . . . man!" (Id. at 06:14–16). At this point, defendant Jarman is standing outside the opened door of the driver-side backset, while defendant Danza, engaging from outside the passenger-side backseat, appears to wrestle with plaintiff over the bag. (Id. at 06:15–27). In the following seconds, as reflected on the audio of the video, defendant Jarman directed plaintiff, "give me the bag," plaintiff repeated "no," and defendant Danza, wrestling with plaintiff from the passenger side, demanded, "give the bag up!" (Id. at 06:17–19). Defendant Danza again stated, "give the bag up!" while defendant Jarman

---

[8]    In his opposing statement of material facts, plaintiff asserts that defendant Danza taunted plaintiff while demanding that plaintiff give up his legal paperwork. (See Pl's Stmt. (DE 44) ¶ 17). Plaintiff also alleges that after he sat in the transport vehicle, defendant Danza stated, "[y]our paperwork ain't . . . leaving, hand over the bag," and defendant Danza "tried to snatch the paperwork from [plaintiff] while taunting [him]." (Id.). The video, however, shows that the officers did not make any of these statements. (See Video 05:47–06:05).

9

called for officer assistance. (Id. at 06:22–25). Plaintiff then began to scream for help and repeatedly stated "leave me alone, man" and "leave me alone" as defendants Jarman and Danza again directed plaintiff to "give [them] the bag" and "give it up." (Id. at 06:25–31). As defendant Jarman explained to the additional arriving officers that plaintiff "won't give [the bag] up," (id. at 06:35–37), defendant Danza screamed at plaintiff multiple times with increased intensity, "give up the bag!" while plaintiff continued to scream out for help and for the officers to "leave [him] alone." (Id. at 06:31–43; see also Pl's Stmt. (DE 44) ¶ 19 (plaintiff admitting that he refused multiple direct orders to hand over the bag); Defs' Stmt. (DE 38) ¶ 19).

Standing by the driver-side backseat door, defendant Jarman next moved towards the inside of the vehicle where plaintiff was positioned lying across the backseat with the top half of his body angled towards defendant Jarman. (See Video 06:44–45). Defendant Danza's head can be seen inside of the vehicle towards plaintiff's bottom half on the passenger side. (Id.). As plaintiff continued to yell, "leave me alone," defendant Jarman again told plaintiff to "give it up" and explained, "we have to take it with us . . . we have to put it in the front seat. You're not allowed to carry it." (Id. at 06:45–52). The commotion between plaintiff and defendant Danza, from the passenger side of the vehicle, persisted and plaintiff again screamed out "leave me alone!" and "get off of me!" (Id. at 06:53–07:02). At this time, plaintiff was "actively, physically resisting" the officers and refusing to give up the bag. (Defs' Stmt. (DE 38) ¶ 20; compare Pl's Stmt. (DE 44) ¶ 20 (failing to provide admissible evidence contradicting defendant's version)).[9]

As other officers arrived at the transport car, including defendant Hall, defendant Jarman

---

[9]    In those circumstances where plaintiff fails to offer admissible evidence contradicting the correspondingly numbered paragraph of defendants' statement, the court adopts defendants' statement notwithstanding any conclusory or non-responsive assertions by plaintiff in his responsive statement. See Fed. R. Civ. P. 56(c) (describing evidence necessary to support a factual position when responding to motion for summary judgment); Local Civ. R. 56.1(a)

again repeated, "give us the bag, now." (Video 07:03–04). The video only captures audio of plaintiff and defendant Danza during the majority of this segment. In between plaintiff's continual pleas to "leave [him] alone" and to "tell [defendant Danza] to get off of me," (id. at 07:05–08), some of the defendants and other officers encouraged plaintiff to relinquish the bag. (See id. at 07:07–09 (defendant Jarman stating that plaintiff "is going to make it worse"); see also id. at 07:05–25 (defendant Hall repeating plaintiff's name, telling him "c'mon," and directing plaintiff to "stop" and "listen")). The video next indicates, and plaintiff does not dispute, that he continued to shield the bag in the backseat of the car, while defendant Danza twice screamed for plaintiff to "give up the bag," (id. at 07:12–13, 07:21–23) and plaintiff exclaimed that one of the defendants, presumably Danza, had "been harassing [plaintiff] all [his] life." (Id. at 07:17–21). Throughout this portion of the interaction, plaintiff repeatedly refused to comply with any of the officers' verbal demands to give up the bag. (Defs' Stmt. (DE 38) ¶ 23; Pl's Stmt. (DE 44) ¶ 23 (plaintiff admitting he refused to comply)).

As reflected on the video, at this point in the altercation, defendant Danza was positioned further inside the vehicle attempting to extract the property bag from the passenger side while defendant Hall was leaning into the backseat from the driver side also attempting to secure the bag. (See Video 07:17–21). Defendants, however, were not striking plaintiff or otherwise using force at this stage other than their attempts to remove the bag. (See id. at 07:17–25).

Plaintiff then appeared to sit up in the backseat (id. at 07:34), at which point defendant

---

(explaining opposing statement of facts must cite to portions of the record contradicting moving party's statement). The court has not, however, limited its review of the record to the evidence cited in plaintiff's statement. As set forth herein, plaintiff's lengthy summary judgment filings, including his sworn response brief, exhibits, and the sworn statement of facts, were reviewed and considered when determining whether plaintiff offers admissible evidence to contradict defendants' statements.

11

Jarman walked back over to the vehicle's passenger side and positioned himself behind defendant Danza. (Id. at 07:34–41). Defendant Danza stood outside of the vehicle with his two hands on plaintiff as plaintiff again implored defendant Danza to "leave [him] alone" and defendant Danza demanded, in turn, that plaintiff "give up the bag!" (Id. at 07:49–52).

Defendant Danza next struck plaintiff with a closed right fist on more than two occasions, while screaming "give up the bag!" along with each strike. (Id. at 07:52–58; Pl's Stmt. (DE 44) ¶ 24). Plaintiff repeated "leave me alone," in response to each blow from defendant Danza. (Video 07:54–08:00). Defendant Danza then used his right knee to strike plaintiff, (id. at 8:01–02), as defendant Jarman, still outside the vehicle's passenger side, directed plaintiff to "put your leg in." (Id. at 08:03–04). Plaintiff emerged from the passenger side, screaming "you're harassing me," and "stop, help somebody!" (Id. at 08:05–11). Plaintiff was positioned with the right side of his body, including his right leg and arm, outside the vehicle. (Id. at 08:08–11). Defendant Danza then administered successive knee blows to plaintiff's right leg, while screaming at plaintiff to "give [him] the bag" and "get in the car." (Id. at 08:12–20; Defs' Stmt. (DE 38) ¶ 26). Around this time, defendant Hall and officer Grant were able to remove the property bag from plaintiff's possession by cutting the bag's drawstring with a pocketknife. (Defs' Stmt. (DE 38) ¶ 25; Pl's Stmt. (DE 44) ¶ 25).

Plaintiff then stepped fully out of the vehicle while stating "no" to defendant Danza. (Video 08:19–21). While standing outside of the car, plaintiff aired grievances regarding his prior legal proceedings (see id. 08:29–31), and defendant Jarman told plaintiff "to get in the car . . . get in the car now! . . . now!" to which plaintiff cried out "no!" (Id. at 08:32–39). Plaintiff also struck defendant Danza in the right arm. (Defs' Stmt. (DE 38) ¶ 26). As plaintiff faced the

12

backseat passenger side of the vehicle, he repeatedly cried out "no" as defendants wrestled with plaintiff and demanded plaintiff get in the car. (Video at 08:40–47). One of the other responding officers, Steve Thompson ("Thompson"), told defendants Danza and Jarman to "turn him around" and "get his back to the car" while plaintiff screamed out "please help" and "no." (Id. at 08:48–59); (Defs' Stmt. (DE 38) ¶ 27).

With the other officers turning plaintiff around, defendant Danza appeared to unholster his taser, at which point another officer quickly stepped in and told defendant Danza "don't." (Video 08:57–09:01). Defendant Danza did not discharge the taser at this point. The visuals from the video are not clear, but defendants continued to direct plaintiff to "get in the car" as plaintiff cried out for help and responded "no!" to each order. (Id. at 09:02–09). At this point, defendant Thompson was able to drag plaintiff into the backseat of the vehicle, although plaintiff's legs remained outside the vehicle and he continued to resist. (Defs' Stmt. (DE 38) ¶¶ 27–28). Officer Thompson then directed the other officers to "punch [plaintiff] in the stomach . . . punch him right in the stomach." (Id. at 09:10–12; Defs' Stmt. (DE 38) ¶ 27). Defendant Danza appeared to punch plaintiff in the stomach at least twice, while exclaiming "get in the car." (Video 09:12–15). Afterwards, plaintiff gasped for air, (id. at 09:15–21), an officer told plaintiff that he was getting in the car "whether he likes it or not," (id. at 09:20–25), and plaintiff continued to scream out for help while still refusing commands to comply and place his legs in the vehicle, (id. at 09:25–31).

Another commotion ensued, not captured by the video, and plaintiff cried out "no!" multiple times. (Id. at 09:31–53). As suggested by the audio, plaintiff was crying out unintelligibly and multiple officers were struggling to secure plaintiff in the car. (Id.).

Defendant Danza told plaintiff to "get it in the car . . . and quit acting a fool." (Id. at 09:53–57). But plaintiff continued to resist the officers' efforts to close the passenger-side door, using his legs to keep the door open. (Defs' Stmt. (DE 38) ¶ 28). With plaintiff's legs still outside the car and plaintiff audibly panting, defendant Danza demanded that plaintiff "put [his] legs in the car, now." (Video at 09:57–10:01). Defendant Danza then asked out loud, "where's the taser," to which defendant Jarman responded, "I got it on me." (Id. at 10:02–04).

The video does not precisely show the taser discharges, but the audio is clear. With plaintiff's legs still outside the vehicle, Thompson said, "well, drive stun him." (Id. at 10:05–06; Defs' Stmt. (DE 38) ¶ 28). Defendant Danza then increased the volume of his directives and ordered plaintiff to "get in the car now . . . I'm gonna tell you once . . . get in the car!" (Video at 10:07–12). Plaintiff is heard breathing deeply in the background, and multiple officers repeated their orders and warnings. (See id. at 10:12–17 (an officer demanding plaintiff "get in the car," "get in the car or you're getting tased . . . period" and another final warning to "get in the car")). After a final order to "get in the car," defendant Danza discharged the taser and plaintiff screamed in distress. (Id. at 10:18–25). Although not precisely clear, the video footage suggests an initial discharge lasting at least four seconds (id. at 10:21–25), and then a second discharge seven seconds later lasting at least another four seconds, (id. at 10:32–36). (See also Pl's Stmt. (DE 44) ¶ 29; Danza Use of Force Report (DE 39-2) Ex. E at 31; Taser Use Report (DE 39-1) Ex. F at 27).[10] Between the first and second taser deployments, officers attempted to forcibly close the passenger-

---

[10]     Consistent with the video evidence, the taser report (which is not challenged by plaintiff) indicates defendant Danza deployed the taser twice, for five seconds each time, with seven seconds between shots, at approximately 10:05 a.m. on the day of the incident. (Taser Use Report (DE 39-1) Ex. F at 27). As discussed further below, the report also provides that defendant Danza deployed the taser a third time approximately one minute later for two seconds. (Id.).

14

side door.  (See Video at 10:21–29).

Plaintiff does not offer admissible evidence describing in detail the taser deployments.  He states only that he was struck "more than once" and that one of the taser shots hit him in his right leg as unidentified officers were holding him down.  (Pl's Br. (DE 43) ¶ 30; Pl's Stmt. (DE 44) ¶ 29).  Defendant Danza's account is set forth below:

> I heard officer Thompson say that someone should drive stun [plaintiff] with a taser because he was refusing to follow orders to get into the car.  I drew my taser and drive stunned [plaintiff] to the right leg.  Although [plaintiff] was almost entirely in the car now, his right foot prevented us from fully closing the rear passenger-side door.  I went to the driver-side of the car to drive stun [plaintiff] in the right shoulder so we could place his foot inside the vehicle.  As I attempted, however, he tried to grab the taser from my hand.  At this point, I drive stunned [plaintiff] again to gain compliance.

(Danza Decl. (DE 39-2) ¶¶ 24–25).  In addition, defendants Jarman and Hall explain that after the first taser shot plaintiff continued to resist by using his legs to keep the passenger-side door open. (Jarman Decl. (DE 39-2) ¶ 30; Hall Decl. (DE 39-3) ¶ 19).  As noted above, plaintiff does not provide evidence disputing these accounts.

After plaintiff was mostly in the vehicle, the officers repeatedly directed plaintiff to "put [his] foot down" and warned him he would be hit by a baton if he failed to comply.  (Video at 10:51–59).  Over the next 30 seconds, as captured by the audio of the video, the officers continued to direct plaintiff to put his foot down or "get your foot in."  (Id. at 11:00–31).  Plaintiff did not comply with this directive.  (Defs' Stmt. (DE 38) ¶ 30).  While unidentified officers held plaintiff down, Thompson struck plaintiff with the baton on multiple occasions.  (Pl's Br. (DE 43) ¶ 30; Pl's Stmt. (DE 44) ¶ 30).  Although the incident is not visually captured on the video, the sound of plaintiff being hit with the baton is on the recording.  (Video 11:39–49).  Also at that time, the sound of a third taser discharge is heard from the driver-side backseat.  (Id. at 11:44–46; Pl's Br.

15

(DE 43) ¶ 30). Ultimately, plaintiff was secured after withdrawing his legs from outside the car, and he was transported to ECI. (Defs' Stmt. (DE 38) ¶¶ 30, 34; Pl's Br. (DE 43) ¶ 31).

Plaintiff suffered unspecified injuries to his right leg, right elbow, and right arm. (Defs' Stmt. (DE 38) ¶ 31). In the aftermath of the incident, plaintiff's leg was "swelling up with fluids" and he was allowed to use a wheelchair. (Pl's Stmt. (DE 44) ¶ 37). Plaintiff's longer-term ailments include difficulty walking stemming from injuries sustained to his right leg, a damaged right middle finger, and various marks on his body. (Id. ¶ 22). Plaintiff was not treated for his injuries at the detention center or during his transport to ECI. (Defs' Stmt. (DE 38) ¶ 35; Pl's Stmt. (DE 44) ¶ 35). Plaintiff saw a nurse upon arrival at ECI, but he did not receive immediate medical attention for the injuries he sustained outside the detention center. (Pl's Stmt. (DE 44) ¶ 35).[11]

Following the incident on November 29, 2021, the Jones County Sheriff's Office charged plaintiff with two counts of assault on a government official. (Defs' Stmt. (DE 38) ¶ 39; Pl's Stmt. (DE 44) ¶ 39).

## DISCUSSION

A.    Standard of Review

Summary judgment is appropriate where "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R.

---

[11]    Plaintiff challenges the sufficiency of the medical care that he received upon arrival at ECI. (See Pl's Stmt. (DE 44) ¶¶ 35–38). The court considers these statements as they pertain to plaintiff's excessive force claims, but plaintiff did not allege Eighth Amendment claims based on the alleged failure to provide medical care in his complaint. Accordingly, the court does not consider separate Eighth Amendment claims plaintiff may assert for the first time in his summary judgment briefing. See Southern Walk at Broadlands Homeowner's Ass'n, Inc. v. OpenBand at Broadlands, LLC, 713 F.3d 175, 184 (4th Cir. 2013). Plaintiff may bring these claims in a new action if he wants to pursue them. The court offers no opinion, however, on the merits of these claims or whether they are barred by the applicable statute of limitations.

Civ. P. 56(a). The party seeking summary judgment "bears the initial responsibility of informing the district court of the basis for its motion, and identifying those portions of [the record] which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986). Once the moving party has met its burden, the non-moving party must then "come forward with specific facts showing that there is a genuine issue for trial." Matsushita Elec. Indus. Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-87 (1986) (internal quotation omitted).

Only disputes between the parties over facts that might affect the outcome of the case properly preclude entry of summary judgment. See Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-48 (1986) (holding that a factual dispute is "material" only if it might affect the outcome of the suit and "genuine" only if there is sufficient evidence for a reasonable jury to return a verdict for the non-moving party). "[A]t the summary judgment stage the [court's] function is not [itself] to weigh the evidence and determine the truth of the matter but to determine whether there is a genuine issue for trial." Id. at 249. In determining whether there is a genuine issue for trial, "evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [non-movant's] favor." Id. at 255; see United States v. Diebold, Inc., 369 U.S. 654, 655 (1962) ("On summary judgment the inferences to be drawn from the underlying facts contained in [affidavits, attached exhibits, and depositions] must be viewed in the light most favorable to the party opposing the motion.").

Nevertheless, "permissible inferences must still be within the range of reasonable probability, . . . and it is the duty of the court to withdraw the case from the [factfinder] when the necessary inference is so tenuous that it rests merely upon speculation and conjecture." Lovelace

17

v. Sherwin–Williams Co., 681 F.2d 230, 241 (4th Cir. 1982) (quotations omitted).   Thus, judgment as a matter of law is warranted where "the verdict in favor of the non-moving party would necessarily be based on speculation and conjecture."   Myrick v. Prime Ins. Syndicate, Inc., 395 F.3d 485, 489 (4th Cir. 2005).   By contrast, when "the evidence as a whole is susceptible of more than one reasonable inference, a [triable] issue is created," and judgment as a matter of law should be denied.   Id. at 489-90.

B.     Analysis

Plaintiff's excessive force claims are analyzed under the Eighth Amendment where he was a convicted and sentenced inmate during the use of force incidents.[12]   Martin v. Gentile, 849 F.2d 863, 870 (4th Cir. 1988); (Defs' Stmt. (DE 38) ¶¶ 12–14); (Pl's App. Ex. B (DE 45-2) at 15–16). The Eighth Amendment prohibits the "unnecessary and wanton infliction of pain" which constitutes cruel and unusual punishment.   Whitley v. Albers, 475 U.S. 312, 319 (1986).   The excessive force inquiry has an objective prong and a subjective prong.   Under the objective prong, the inmate must establish that the force used was "nontrivial" or more than "de minimis."   Wilkins v. Gaddy, 559 U.S. 34, 39 (2010) (per curiam); Hudson v. McMillian, 503 U.S. 1, 10 (1992). Here, plaintiff offers sufficient evidence to survive summary judgment on the objective component of the claim, (see, e.g., Pl's Stmt. (DE 44)), and defendants do not argue otherwise.   Thus, the court proceeds to the subjective component of the claim.

To satisfy the subjective prong, the inmate must show a prison official acted with a "sufficiently culpable state of mind."   Wilson v. Seiter, 501 U.S. 294, 297 (1991).   In an

---

[12]     Defendants appear to rely on the Fourteenth Amendment standard, which governs excessive force claims brought by pretrial detainees.   (Def's Mem. (DE 40) at 14).   That is not the correct standard for the reasons explained above.

excessive force case, "the state of mind required is wantonness in the infliction of pain." Brooks v. Johnson, 924 F.3d 104, 112 (4th Cir. 2019). The relevant inquiry for the subjective prong is whether the force was applied "in a good faith effort to maintain or restore discipline," or "maliciously" and "for the very purpose of causing harm." Whitley, 475 U.S. at 320–21; Brooks, 924 F.3d at 113. The "question is not whether a reasonable officer could have used force to maintain discipline, but whether these particular officers did use force for that reason." Brooks, 924 F.3d at 113. "Corrections officers act in a good faith effort to maintain or restore discipline – that is, with a permissible motive – not only when they confront immediate risks to physical safety, but also when they attempt to preserve internal order by compelling compliance with prison rules and procedures." Id.; see also Dean v. Jones, 984 F.3d 295, 302 (4th Cir. 2021). "But corrections officers cross the line into an impermissible motive – using force maliciously and for the very purpose of causing harm – when they inflict pain not to induce compliance, but to punish an inmate for intransigence or to retaliate for insubordination." Brooks, 924 F.3d at 113; Williams v. Benjamin, 77 F.3d 756, 765 (4th Cir. 1996).

At the summary judgment stage, "the inquiry under the subjective prong boils down to whether a reasonable jury could determine that an officer acted with malice, applying force punitively and for the very purpose of causing harm." Dean, 984 F.3d at 302. The officers' subjective motive may be proved through direct or circumstantial evidence. Id. at 308–09; Brooks, 924 F.3d at 114–16. With respect to circumstantial evidence, the court considers four factors "from which . . . inferences may be drawn as to the officers' motives." Brooks, 924 F.3d at 116. These factors are: "(1) the need for the application of force; (2) the relationship between the need and the amount of force that was used; (3) the extent of any reasonably perceived threat

19

that the application of force was intended to quell; and (4) any efforts made to temper the severity of a forceful response."  Whitley, 475 U.S. at 321 (hereinafter, the "Whitley factors"); Dean, 984 F.3d at 302.   In the instant procedural posture, the court generally must apply these factors while viewing the facts in the light most favorable to the plaintiff.   See Dean, 984 F.3d at 301–07.

However, where the record includes "facts . . . depicted by . . . videotape," the court is guided by the Supreme Court's direction that "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, [inclusive of video footage,] so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment."   Scott v. Harris, 550 U.S. 372, 381 (2007); Iko v. Shreve, 535 F.3d 225, 230 (4th Cir. 2008) ("[W]here, as here, the record contains an unchallenged videotape capturing the events in question, we must only credit the plaintiff's version of the facts to the extent it is not contradicted by the videotape.").   But "[s]ummary judgment is proper under Scott only when there is evidence – like the videotape in Scott itself – of undisputed authenticity that shows some material element of the plaintiff's account to be blatantly and demonstrably false." Harris v. Pittman, 927 F.3d 266, 276 (4th Cir. 2019).

Here, as a threshold matter, where plaintiff fails to marshal any evidence of defendant Taylor's involvement in the altercation outside the detention center, the motion for summary judgment is granted as to plaintiff's claims against defendant Taylor.   (See Pl's Stmt. (DE 44) ¶ 33 (plaintiff acknowledging he named the wrong defendant)); see Ashcroft v. Iqbal, 556 U.S. 662, 676 (2009) ("Because vicarious liability is inapplicable to . . . § 1983 suits, a plaintiff must plead that each Government-official defendant, through the official's own individual actions, has violated the Constitution.").

20

As to the remaining defendants, the court analyzes their uses of force 1) prior to obtaining control of plaintiff's property bag, and 2) after obtaining control of the bag. The court then turns to plaintiff's official capacity claims.

1.     Use of Force Prior to Securing Plaintiff's Property Bag

As to that part of the altercation where plaintiff refused to turn over his personal property bag and shielded it from defendants, the court concludes defendants applied force in a good faith effort to maintain and restore discipline.

The first and third <u>Whitley</u> factors, the need for application of force and the perceived threat that the application of force was intended to quell, weigh in defendants' favor in these circumstances. "[O]fficers act in a good faith effort to maintain or restore discipline . . . when they attempt to preserve internal order by compelling compliance with prison rules and procedures." <u>Brooks</u>, 924 F.3d at 113. Here, plaintiff defied defendants' multiple direct orders to relinquish his property bag. (<u>See</u> Video 06:00–07:52). Plaintiff admits as much but he attempts to justify his noncompliance by asserting that his bag consisted of legal documents and other evidence allegedly revealing constitutional violations committed by defendants. (<u>See</u> Pl's Br. (DE 43) ¶¶ 26, 27).[13] But even accepting that as true, plaintiff had no right to refuse these lawful commands. Defendants offer uncontradicted evidence that detainees cannot maintain possession of the property bag during transport for safety reasons. (Defs' Stmt. (DE 38) ¶ 4; Jarman Decl. (DE 39-1) ¶ 9; Danza Decl. (DE 39-2) ¶ 9; Hall Decl. (DE 39-3) ¶ 9).

As discussed further below, plaintiff was given multiple opportunities to comply with the verbal orders to relinquish the bag but he refused to do so. Defendants could not simply acquiesce

---

[13]     Plaintiff denies that his bag contained sealed items, such as his cell phone or jewelry, so the court accepts that fact in plaintiff's favor at this stage. (<u>See</u> Pl's Stmt. (DE 44) ¶ 17).

to plaintiff's obstinate behavior and still maintain discipline. Plaintiff thus left defendants with no choice but to use force. See Brooks, 924 F.3d at 113. And the perceived threat was present throughout this portion of the incident where plaintiff continually refused to relinquish the bag. (See generally Video; Pl's Br. (DE 43) ¶ 27 (plaintiff admitting that he refused to relinquish the bag notwithstanding defendant Danza's direct orders)).

Turning to the second factor, the relationship between the need and amount of force used, plaintiff argues the force was not justified where he "was beat across the back and multiple other areas on his body including punched in the face, head, arms, legs and ribs by Danza, Grant, Thompson, Hall and Jarman." (Pl's Br. (DE 43) ¶ 30). However, after plaintiff refused to hand over his personal property bag, and before other responding officers arrived at the transport car, defendants Danza and Jarman repeated verbal instructions almost a dozen times, with increasing intensity, for plaintiff to give up his bag. (See Video 05:56–07:02). During this initial period, defendant Danza wrestled with plaintiff over the bag in the backseat and applied pressure points to induce compliance. (See Danza Use of Force Report (DE 39-2) Ex. E at 31); (see also Video 06:44–07:02).

Defendant Danza began striking plaintiff with increased levels of force almost two minutes after plaintiff's initial resistance. (See Video 07:52–08:21). Defendant Danza struck plaintiff's torso region with a closed fist at least twice and administered successive knee blows to plaintiff's right leg. (See id.). Simultaneous to each strike, defendant Danza yelled at plaintiff to relinquish his personal property bag, and plaintiff repeatedly screamed out "no" in response. (See id.). Neither the video nor plaintiff's extensive summary judgment filings establish that he stopped resisting the officers at any point. In his statement of material facts, plaintiff admits to resisting

22

the officers as defendants continuously instructed plaintiff to turn over his property bag. (See Pl's Stmt. (DE 44) ¶¶ 19, 20); Cf. Brooks, 924 F.3d at 114 (holding genuine dispute of material fact precluded summary judgment where officer deployed pepper spray after plaintiff had clearly stopped resisting and was lying on the ground). Accordingly, the second Whitley factor weighs in favor of defendants where this was a volatile set of circumstances justifying successively increasing applications of force by defendants.

The fourth Whitley factor – whether defendants made efforts to temper the severity of the response – also weighs in favor of finding that defendants' actions were a good faith effort to maintain or restore discipline. As set forth above, defendants attempted to avoid using escalating force by giving plaintiff multiple verbal orders to hand over his personal property bag despite plaintiff's active resistance. And they did not punch or kick plaintiff until after attempting, unsuccessfully, to forcefully remove the bag from plaintiff's possession. (Video 06:05–07:52). Plaintiff failed to comply and, at each turn, attempted to shield the bag from defendants. (See id.).

Thus, as to that part of the altercation where defendants had not yet obtained control of plaintiff's property bag, upon consideration of the record against the Whitley factors, and particularly in light of plaintiff's active resistance and noncompliance with lawful orders, the court finds no reasonable jury would find that defendants acted maliciously and for the very purpose of causing harm.

A common theme of his briefing, plaintiff argues that defendants assaulted him not because he failed to comply with defendants' lawful orders, but because of his extensive efforts to expose purported constitutional violations by Jones County officials as well as defendants' animus

towards sex offenders. (See Pl's Stmt. (DE 44) ¶¶ 4, 5); (see also Pl's Br. (DE 43) ¶ 24 ("[Defendants] Danza and Jarman planned this whole excessive force incident out . . . to go through [p]laintiff's personal property bag thoroughly to remove all of his evidence."). Plaintiff also emphasizes that defendant Danza was involved in plaintiff's various prosecutions for failure to register as a sex offender, and that he was upset with plaintiff because plaintiff was found not guilty of some of the charges. (Pl's Br. (DE 43) ¶¶ 1–12). Finally, plaintiff relies on sworn statements indicating defendant Danza had previously threatened plaintiff with force and showed up at plaintiff's residence intoxicated and made vague threats that he was going to "get" plaintiff. (See id. ¶ 25). As to the threatening statement, plaintiff avers that defendant Danza "threaten[ed] [p]laintiff in [the detention center] that [Danza] 'would beat the [expletive] out of [plaintiff], and none of [plaintiff's] paperwork would ever leave his jail." (Id.).

The court begins with plaintiff's arguments regarding his efforts to expose defendants' alleged corruption. In this regard, plaintiff argues primarily that defendants relied on the policy regarding the property bag as a pretext to confiscate and destroy plaintiff's legal documents and other evidence of corruption. (Pl's Br. (DE 43) ¶ 26; Pl's Stmt. (DE 44) ¶¶ 17–18, 20). Plaintiff ignores the fact that defendants allowed plaintiff to place all of the documents in a property bag to take to ECI. If defendants wanted to destroy these documents, it is difficult to understand why they would wait until after plaintiff placed them in the property bag and he was being transported to ECI to do so. In any event, plaintiff's speculative theory on this point is refuted by the fact that defendants did not destroy the documents. (See Pl's Stmt. (DE 44) ¶ 18 (plaintiff "inform[s] the court . . . that I still have most of the documents made/obtained in Jones County, and Craven County . . . to present to you, and the courts.")). And to the extent plaintiff suggests some

24

documents may have been destroyed, he fails to offer any specific evidence describing such documents or otherwise supporting this conclusory statement. Such speculative and conclusory assertions are insufficient to create a triable issue of fact. See Wai Man Tom v. Hospitality Ventures, 980 F.3d 1027, 1037 (4th Cir. 2020) (explaining "conclusory allegations . . ., without more, are insufficient to preclude granting the summary judgment motion"); Graves v. Lioi, 930 F.3d 307, 324 (4th Cir. 2019) ("[S]urviving summary judgment . . . requires evidence, not unsupported conjecture.").

Turning to defendant's Danza's statement that he would "beat the [expletive] out of plaintiff," plaintiff provides no additional information about the statement,[14] such as when it occurred, or the general context of the interaction between him and defendant Danza when he made the statement. Thus, there is no evidence that defendant Danza stated he planned to assault plaintiff during the transport to ECI, or that he made the statement close in time to or in a manner that suggested impermissible motive during the transport. As a result, plaintiff's conclusory statement that defendant Danza threatened to assault him does not create a genuine dispute of fact when considered against the evidence and analysis of the Whitley factors set forth above. See Wai Man Tom, 980 F.3d at 1037; cf. Dean, 984 F.3d at 294 (holding officers' specific statements at the time of the use of force created genuine dispute of fact as to impermissible motive); Brooks, 924 F.3d at 114–15 (discussing direct evidence of impermissible motive close in time to the incident).

Furthermore, even considering the alleged threat at the detention center and at plaintiff's residence, and plaintiff's allegations of corruption generally, the record belies plaintiff's theory

---

[14]     Plaintiff cites to "exhibit E" as record support for this statement, but there is no exhibit E in plaintiff's appendix. (See DE 45).

that defendants assaulted him out of personal animus or general hatred of sex offenders. The officers gave plaintiff lawful commands to relinquish the property bag, warned him they would use increasing amounts of force if he did not comply, and gave direct verbal orders before using force. (Video 06:04–11). It was within plaintiff's power to relinquish the bag at any time leading up to the use of force incident, and on this record no reasonable jury could conclude that defendants would have proceeded to use force if plaintiff complied with the directives. Moreover, the record confirms that multiple officers determined force was necessary to gain compliance, while plaintiff offers evidence of specific punitive intent only as to defendant Danza. Accordingly, a reasonable jury would not conclude that the use of force was excessive when presented with the video evidence and other uncontested submissions. See Dean, 984 F.3d at 302.

Turning to plaintiff's remaining arguments, he emphasizes that defendants interfered with or destroyed his legal mail while he was in the detention center, refused to permit visits with his attorneys and other members of the community, and they decided to transfer him immediately after he requested that Holloway contact a local newspaper about his allegations of corruption. (Pl's Br. (DE 43) ¶¶ 14–15, 21, 24; Pl's Stmt. (DE 44) ¶¶ 5, 8, 13–15). Even accepting these allegations as true, they do not establish that the force itself was malicious or retaliatory. Plaintiff admits he failed to comply with numerous direct orders to relinquish his property bag, and no reasonable jury would conclude the officers would have used force if plaintiff had simply complied with these commands.

As to plaintiff's purported evidence of retaliatory/punitive intent during the incident, the only alleged statement is refuted by the video. Plaintiff asserts that immediately before the physical altercation in the patrol vehicle, defendant Danza told plaintiff, "your paperwork . . . isn't

26

leaving, hand over the bag." (Pl's Stmt. (DE 44) ¶ 17; see also Pl's Br. (DE 43) ¶ 27). But the video establishes this statement is false. During the initial stages of the transfer, defendant Danza silently led plaintiff out of the detention center (see Video 05:17–50), and it was only once plaintiff was placed in the backseat of the vehicle that defendant Danza asked plaintiff to "see the whole bag." (Id. at 05:56–06:00). Thus, as to this particular allegation, where plaintiff's version is "blatantly contradicted by the record," the court need not adopt it. Scott, 550 U.S. at 381

Further, while plaintiff swears that his property bag did not contain any sealed items, plaintiff does not contest or offer evidence that refutes defendants' description of the detention center's transportation policy. (See, e.g., Jarman Decl. (DE 39-1) ¶ 9) ("[I]nmates are not allowed to carry their property bags, regardless of their contents, during transport, and so the property bags must remain in the vehicle's trunk or with the detention officers."). "Prison administrators . . . should be accorded wide-ranging deference in the adoption and execution of policies and practices that in their judgment are needed to preserve internal order and discipline and to maintain institutional security." Whitley, 475 U.S. at 321–22.[15] Therefore, plaintiff does challenge that he was resisting defendants' lawful order.

In sum, even construing the record in plaintiff's favor, where the court assumes that defendant Danza made previous threatening and malicious statements to plaintiff, that defendants interfered with his mail and legal paperwork, and that they harbored personal animus against plaintiff or sex offenders generally, no reasonable jury could conclude this particular use of force was excessive under the Eighth Amendment. Thus, as to that part of the altercation where defendants had not yet obtained control of plaintiff's property bag, upon consideration of the

---

[15]    Internal citations and quotation marks are omitted from all citations unless otherwise specified.

record against the Whitley factors, and particularly in light of plaintiff's active resistance and noncompliance with lawful commands, the court finds no reasonable jury would find that defendants acted maliciously and for the very purpose of causing harm.

2.  Use of Force After Securing Plaintiff's Property Bag

Turning to that part of the altercation after defendants obtained control of plaintiff's property bag, the court again concludes defendants applied force in a good faith effort to maintain and restore discipline and subdue plaintiff's physical resistance.

Here, the need for application of force and the perceived threat that the application of force was intended to quell weigh in defendants' favor.   After defendants were able to secure the property bag, plaintiff extracted himself from the patrol vehicle and resisted officers' efforts to get back into the car.   Defendant Jarman and other officers repeatedly directed plaintiff "to get in the car . . . get in the car now" to which plaintiff cried out "no" multiple times.   (See Video 08:32–47).   Far from complying with these directives, plaintiff then escalated the situation by striking defendant Danza.   (Defs' Stmt. (DE 38) ¶ 26).

Moreover, defendants believed plaintiff was trying to escape custody where plaintiff had pushed his way to a standing position outside the vehicle.   (See Jarman Incident Report (DE 39-1) Ex. G at 29; see also Thompson Use of Force Report (DE 39-2) Ex. C at 23); see Williams, 77 F.3d at 763 ("Hence, even accepting [the plaintiff's] version of the events, the guards' perception that the inmates were throwing foul liquids was reasonable, and they could reasonably perceive such conduct as posing a more significant threat.").   While plaintiff denies that he was attempting to escape custody (see Pl's Stmt. (DE 44) ¶ 28), he does not dispute that he was outside the patrol vehicle in an unrestricted area, that he actively resisted defendants' directives to get back in the

28

car, or that he physically resisted defendants by pushing out of the car and kicking at the officers. (See Hall Incident Report (DE 39-1) Ex. G at 31); (see also Thompson Use of Force Report (DE 39-2) Ex. C at 22). Further, even after defendants applied increasing amounts of force by striking plaintiff in the stomach (Video 09:10–15), plaintiff refused to comply, and his legs remained outside of the vehicle. Thus, the need for the application of force and the perceived threat weigh in defendants' favor.

Turning to the second Whitley factor, plaintiff asserts that defendants used unnecessary, escalating force against him where defendant Danza discharged a taser multiple times. (See Pl's Stmt. (DE 44) ¶¶ 29, 30). Plaintiff alleges that the pain was so great that he feared he was having a heart attack or stroke. (Pl's Br. (DE 43) ¶ 30).

The use of the taser, of course, must be considered in context of the overall incident. See Brooks, 924 F.3d at 114–15. As set forth above, plaintiff ignored multiple direct orders to get in the patrol vehicle, and he punched defendant Danza in the arm. (Defs' Stmt. (DE 38) ¶ 26). Defendant Danza unholstered his taser a short time later, but he did not tase plaintiff at that stage, agreeing with another officer who indicated that the taser was unnecessary at that stage. (Video 08:57–09:01).

Although the officers were able to place plaintiff in the vehicle, he continued to resist by keeping his legs outside the vehicle. (Defs' Stmt. (DE 38) ¶¶ 27–28). Thompson then instructed defendant Danza to punch plaintiff in the stomach, which he did. (Video at 09:10–15; Defs' Stmt. (DE 38) ¶ 27). As plaintiff continued to resist, the officers then warned plaintiff he would be tased if he did not place his feet in the vehicle. (Defs' Stmt. (DE 38) ¶ 28; Video 10:05–12). Defendant Danza then fired the taser once for approximately four seconds. (Video 10:21–25).

29

But plaintiff continued to resist even after the first discharge of the taser, including by attempting to grab the taser and using his legs to keep the passenger-side door open. (Danza Decl. (DE 39-2) ¶¶ 24–25; Jarman Decl. (DE 39-2) ¶ 30; Hall Decl. (DE 39-3) ¶ 19).

The foregoing set of facts stands in contrast to prior cases in which the United States Court of Appeals for the Fourth Circuit has found summary judgment inappropriate in the context of taser shots. In Orem v. Rephann, for example, the Fourth Circuit concluded that although "some action was necessary to calm [the arrestee] and safely transport her," a jury could view the officer's use of a taser as wanton and unnecessary where the officer "tasered the arrestee immediately after she used profanity towards him . . . and, after shocking the arrestee, the officer commanded that she respect the officers." 523 F.3d at 446. In Iko v. Shreve, the Fourth Circuit found that the officer's "several additional bursts of pepper spray after Iko attempted to comply with orders" cut against the officers under the second Whitley factor where Iko had also "remained docile and passive throughout the cell extraction." 535 F.3d at 239–40. And in Brooks v. Johnson, the Fourth Circuit concluded that a jury could conclude that "three [taser] shocks together . . . could infer wantonness in the infliction of pain, intended not to restore order and induce compliance, but to punish Brooks for his belligerence" including where Brooks had "writhed and kicked and then laid still" in between taser shocks. 924 F.3d at 115.

But here, plaintiff never asserts that he stopped resisting or attempted to comply with defendants after any of their discrete uses of force. Cf. Dean, 984 F.3d at 302 (reversing summary judgment to the defendant officers where plaintiff had marshalled evidence that he "was completely restrained and not resisting . . . lying on the floor with his hands cuffed behind his back and trying to curl up to protect himself as he was punched and kicked repeatedly by numerous

30

officers"). Indeed, after the first use of the taser and before the second discharge, defendant Danza avers that plaintiff "attempted to grab the taser from my hand." (See Danza Incident Report (DE 39-1) Ex. G at 31).

This case better parallels Grayson v. Peed, where the plaintiff "refused to relent, even after repeated entreaties," and the Fourth Circuit found that the force applied by correctional officers was "in a good faith effort to maintain or restore discipline." 195 F.3d 692, 696 (4th Cir. 1992); Cf. Sawyer v. Asbury, 537 F. App'x 283, 294 (4th Cir. 2013) ("Unlike Grayson, in this case the video clearly reveals that Sawyer did not attempt any violent, unruly, or evasive act before Deputy Asbury hit him in the face. As in Orem, . . . the officer's assault here was provoked by the detainee's verbal tirade and/or his intransigence and failure to heed instructions.)" Thus, while a closer call than the first and third factors, the second Whitley factor also weighs in favor of defendants.

Plaintiff also asserts that he was fully restrained during the altercation, both handcuffed at his wrists and shackled around his ankles. Although whether a detainee was restrained is a relevant consideration in an excessive force analysis, the "distinction is not determinative." Sawyer, 537 F. App'x at 294. Here, as explained above, the use of force was justified by plaintiff's failure to comply with numerous lawful direct orders, and the officers' concerns for their own safety or plaintiff's potential escape when he was outside of the transport vehicle. See Brooks, 924 F.3d at 117–18 ("Detention Center officers were permitted to insist on Brooks's compliance with their photograph policy, and when he resisted, they were permitted to take measures, including the use of appropriate force, intended to secure his cooperation.").

The fourth Whitley factor – whether defendant made efforts to temper the severity of the

31

response – also supports defendants. As set forth above, defendants attempted to temper some uses of their force by warning plaintiff beforehand. (See Video 10:12–17 ("get in the car or you're getting tased . . . period" followed by another warning to "get in the car"); see also id. at 11:34–39 ("put your foot in . . . put your foot in . . . or you're going to get this.")). Indeed, at one point, one of the other responding officers directed defendant Danza not to discharge his taser. (Id. at 08:57–09:01).

In sum, as to that part of the altercation where defendants had secured plaintiff's property bag and where plaintiff resisted entering the backseat of the vehicle, upon consideration of the record against the Whitley factors, and particularly in light of plaintiff's noncompliance and his active resistance, the court finds no reasonable jury would find defendants acted maliciously and for the very purpose of causing harm.

The court next turns to the final portions of the incident. As to Thompson striking plaintiff with the baton, Thompson is not a named defendant in this action and there is no evidence suggesting defendants knew that Thompson would use excessive force. And while it is true that a third taser deployment is heard on the video during baton incident, the taser was deployed for two seconds while plaintiff refused to put his feet in the vehicle and after multiple verbal orders for plaintiff to get in the car. (See Taser Use Report (DE 39-1) Ex. F at 27; Video 11:30–46; Defs' Stmt. (DE 38) ¶¶ 29–30). No reasonably jury would conclude that use of force was excessive for the same reasons discussed above. See Brooks, 924 F.3d at 117–18.

Finally, to the extent plaintiff relies on the fact that defendants did not arrange immediate medical care after the incident as evidence of retaliatory or punitive intent, plaintiff fails to offer evidence showing that he requested such care or that an imminent medical issue was readily

32

apparent. Moreover, plaintiff was seen by a nurse when he arrived at the ECI. (Pl's Stmt. (DE 44) ¶ 35).

### 3. Official Capacity Claims

To the extent plaintiff asserts claims against defendants in their official capacities, defendants are entitled to judgment as a matter of law for these claims as well. In order to establish a constitutional claim against Jones County or the Jones County Sheriff's Office[16] under the doctrine of <u>Monell</u> liability, plaintiff must show that the county's "policy or custom, whether made by its lawmakers or by those whose edicts or acts may fairly be said to represent official policy, inflicts the plaintiff's injury." <u>Monell v. Dep't of Soc. Servs. of City of New York</u>, 436 U.S. 658, 694 (1978); <u>Santos v. Frederick Cnty. Bd. of Comm'rs</u>, 725 F.3d 451, 469–70 (4th Cir. 2013). A local government entity may be held liable pursuant to § 1983 in the following four scenarios:

> (1) through an express policy, such as a written [policy or procedure]; (2) through the decisions of a person with final policymaking authority; (3) through an omission, such as a failure to properly train officers, that "manifests deliberate indifference to the rights of citizens"; or (4) through a practice that is so "persistent and widespread" as to constitute a "custom or usage with the force of law."

<u>Lytle v. Doyle</u>, 326 F.3d 463, 471 (4th Cir. 2003) (quoting <u>Carter v. Morris</u>, 164 F.3d 215, 218 (4th Cir. 1999)). As to the excessive force incidents, plaintiff has not offered admissible evidence establishing that a policy or custom attributable to the county or the sheriff's office inflicted his injury. And to the extent plaintiff is alleging a policy or custom as to other constitutional

---

[16] The parties do not address whether Jones County, the sheriff's office, or some other defendant, is the appropriate entity for purposes of analyzing plaintiff's official capacity claim. <u>See Parker v. Bladen</u>, 583 F. Supp. 2d 736, 739 (E.D.N.C. 2008) (discussing legal distinctions between county and sheriff's office under North Carolina law).

33

violations, as discussed above he cannot assert new claims in his summary judgment briefing.

See Southern Walk at Broadlands Homeowner's Ass'n, 713 F.3d at 184.

## CONCLUSION

Based on the foregoing, defendants' motion for summary judgment (DE 37) is GRANTED. The clerk is DIRECTED to close this case.

SO ORDERED, this the 27th day of March, 2024.

_____
LOUISE W. FLANAGAN
United States District Judge